Good morning. Welcome to Day 3 of our sitting here in Jacksonville. Happy to be back. We have five cases this morning. Our tentative plan is to go straight through all five, but that could change. Before we get going, just a few reminders for you. Number one, most importantly, we've read your materials. We've read the briefs, the record, the cases, the statutes, all of it. You've got limited time before us, so don't waste it with a bunch of factual and procedural ramp-up. Just get to the issues that you think are most important. Number two, the traffic light system, I think you'll understand. Green is go, yellow is slow, red is stop, as I've said. I'm not great at cutting people off in the middle of a syllable. It's just kind of not in my nature, but when you see the red light, just please respect the court's time and wrap up. We'll have questions for you along the way. All right. With that, let's call the first case, United States v. Moore, 25-10088. We have Ms. Keim here for the appellant, Ms. Acosta here for the appellee. Ms. Keim, you've reserved three minutes. Very well. Proceed when ready. Stacey Keim May it please the court, counsel. Good morning. My name is Stacey Keim, and I represent the appellant, Jesse Moore. And before turning to the issue where I hope to spend my time today, which is the second amendment issue, issue five, I need to make an important clarification or correction on issue two regarding the subpoena. In the briefs, I said that there was not proof that Rita Sue Martin was present or available at trial. Regrettably, I discovered earlier this week a transcript, a line in the transcript at page 173 that establishes to me that she was there. It doesn't wholly defeat our argument, but in all candor, it's something I wanted to correct at the court up front. We appreciate that. Turning to issue five, I'd like to start by explaining why this case is not governed by Wilson or Miller. Wilson, this court's precedent, involved not just any old short-barreled shotgun, but a particular type of short-barreled shotgun, a sawed-off shotgun. And as Wilson recognized, that's the very same weapon that was at issue in Miller. Sot? Heller seemed to suggest not that there's some exception for short-barreled shotguns, but that there's exceptions for particular weapons that are not in common use, such as the short-barreled shotguns citing C. Miller. In other words, there isn't anything magic, it seems to me, about a short-barreled shotgun, but there is something magic about the NFA and the things that are listed there, possibly. We recognize that ourselves, and I think it's tagged, where another one of the listed items, we said, was sort of outside the purview and fell within that Heller exception. So tell me why Miller is only limited to this one thing and somehow can't apply outside of it. Your Honor, I think the court in Heller made clear that Miller should never be read for more than it actually explicitly states, but I do have, to your Honor's point, two responses. Regarding the relative popularity of short-barreled rifles versus short-barreled shotguns, short-barreled rifles are more than five times more popular, so they are more commonly used. Where are you getting that from? From ATF statistics. Right. And you get that because people actually have to register for that, right? Exactly, Your Honor. Yeah. I'm not sure that works to your favor, because if you take the Seventh Circuit, who has dealt with a similar issue, what they have said is, this line of cases that you're relying on, the Brewer, the Bruin, Rahimi, and sort of the post-Heller line of cases, deals with what essentially are categorical exclusions. In other words, you just either can't get it because it's illegal, or we're going to make it almost impossible for you to, or someone in sort of the May cases, there's a discretionary bar which doesn't allow you to necessarily have it. As I read the NFA, it is a shall-issue case, it is a shall-issue statute, and as you point out, plenty of people seem to be able to get it as long as they pay their tax. Why is that a barrier that the Second Amendment isn't all concerned about? And let me just give you this, let me ask you this while we're doing that. If Walmart, for example, charges state sales tax when they sell a firearm, I don't know if they still sell firearms, but assuming they still do, they charge a state sales tax. No one disputes that a state can charge sales tax on a regular item just like it can anything else as part of its taxing authority. Why would this be any different? Your Honor, two responses to that, and then I do hope to be able to circle back to the unique difference with sawed-off shotguns. In Mr. Moore's case, he, at the end of the month after paying his expenses, he had about $3.92 left over. So to register the shotguns, or excuse me, the rifles at issue here, it would have taken him almost 13 years. Your Honor's question also implicates kind of principles. The Second Amendment can't be based on one's financial situation. I understand he can't afford it, but it's not prohibited. Listen, you can ask family members. Let me put it this way. He has enough money for an arsenal of guns hanging from the ceiling of his house. If he has enough for that, he certainly has enough for a stamp that ATF sells in order to allow someone to do it. So that, to me, is not a barrier. And, Your Honor, I don't mean to resist the question, but Your Honor's question does implicate step two of Bruin analysis on which the government bears the burden. I'd be happy to address particular statutes. Do we get there? No, my question is, we don't seem to get there. And Bruin itself sort of distinguishes the may from the shall. In other words, what Bruin dealt with was a statute which says, if you're a state, I have discretion to be able to give you your concealed weapons permit, and I'm not going to do it unless these factors are met. And in reality, almost no one got it. But as you just pointed out, ATF regularly, first of all, it shall as part of the statute, but regularly issues stamps for these very weapons. So how are they at all, how does this all fall within any sort of categorical exclusion or regulatory regime that impinges on the right enough to be able to implicate the Bruin two-step analysis? Your Honor, the sales tax would be meaningfully different from the rigorous application requirements through the ATF. Not only do you have to pay the $200 fine at the time, at least, you need to submit a photo ID, your fingerprints, other personal information, notify local authorities, explain why it would be reasonably necessary for you to acquire the firearm, wait for approval, and then after approval, be listed in a national database with the firearm's serial number, obtain ATF permission before crossing state lines, notify ATF of address changes, and while in possession of the firearm, maintain registration documentation and give it to the ATF officer upon request. Now if I may circle back and explain what's so specifically unusual and dangerous about the weapon. Why is the Seventh Circuit wrong in distinguishing the Bruin line of cases for exactly the thing that we're talking about? I understand the litany you just went through, and yet five times more people have this weapon than a short-barreled shotgun. Your Honor, because those cases specifically note that no meaningful difference has been presented between a short-barreled shotgun and a short-barreled rifle, so I'd like to explain the meaningful difference. I'm not sure that's what the Seventh Circuit holds. I'm just not. But do tell me, based on the definitions, the statutory definitions, what the difference is. So a sawed-off shotgun is unique because shotguns are unique. A full-length standard shotgun, by and large, almost all shotguns today and almost all shotguns back in the 30s contain an important feature that's unique to shotguns. It's a safety feature. And that safety feature is located in the last one to three inches of the firearm's barrel right before the muzzle. If you cut off with a hacksaw the end of the barrel, you're cutting off the safety feature. Now, I'd like to describe the feature. Counsel, I'd much prefer to talk about the statute. So if we look at 26 U.S.C. By the way, 26 statutes are tax statutes. But if we look at the 26 series U.S.C. Section 5845D, which defines what a shotgun is, it defines it as a weapon intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore, either a number of projectiles, a ball shot, or a single projectile for each pull of the trigger. A rifle, on the other hand, which is defined in Subsection C of the same statute I just talked about, is a weapon intended to be fired from the shoulder, just like a shotgun, designed or redesigned and made or remade for use of an energy of an explosive in a fixed cartridge, just like a shotgun, to fire only a single projectile. So the only difference there is while a shotgun also is for a single projectile, it could be for a ball projectile through a rifled bore. So unlike the shotgun, which is a smooth bore, it has a rifled bore for each single pull of the trigger. So the only difference that I could tell between them is the rifled bore versus the smooth bore, right? Your Honor, there's another critical distinction right there in the statute that Your Honor just read respectfully. Shotguns take a number of projectiles, a ball shot. A ball shot can contain a... Or a single projectile. In other words, a shotgun could be one that has a ball shot or a single projectile. And that's exactly what a rifle is. Your Honor, I think the distinction is quite meaningful, and here's why. The safety feature at the end of the shotgun is essential to be able to ethically and reliably fire the multiple projectile spray that is characteristic uniquely of shotguns. Now, the feature is called a choke. The choke is located at the very end of the muzzle, and it cannot be sawed off without turning the weapon into something that is truly dangerous and unusual. With the choke in place, it's a conical-shaped device that tapers the barrel of the firearm as it leads to the edge of the muzzle. What that does is forces that spray to distribute slowly, gradually, and reliably, and allow you to hit... Definitionally, everything you've just said is a ball shot, and that may be how a shotgun is often used. But definitionally, it includes that and a single projectile. Yes, Your Honor. And that same single projectile is also part of the definition of a rifle. And so, definitionally, they seem almost identical to each other, other than the rifling in the barrel and the non-rifling smoothness of the shotgun barrel. Well, the difference is that with a rifle, if you were to take the rifle's barrel and shorten it, you're only making it more similar to a pistol. You're not sawing off the safety feature built into the shotgun. But you'd be doing the same thing for a shotgun where it's a single projectile shotgun. So, Your Honor, I believe that it's not actually like a shotgun that is single projectile. I think the shotgun accepts bullets either single... You can either put single cartridges or ball cartridges. I'm just reading you the definition. Through a smooth bore, either a number of projectiles through a ball shot, or a single projectile for each pull. Your Honor, the fact that a shotgun is categorically capable of spraying bullets in such a manner... So, without the choke, the bullets spray in all directions. They're going to fly through walls and... Only in a ball shot, not in a single projectile, right? Yes, Your Honor. That's correct. And I guess circling back to where we started, if Miller is saying that this one is okay and a rifle is almost identical to at least part of the definition of what a shotgun is, except for that there's some grooves inside the rifle and there's not grooves inside the  Your Honor, I'm sorry. There's one more critical distinction, which is that when you're sawing off the edge of a barrel yourself post-manufacture, it's a crude, homemade modification, which is going to necessarily... That's true of a rifle, too. And Your Honor, if my client were charged with a sawed-off rifle, we would have a different situation. We wouldn't have the missing choke, but we would still have a do-it-yourself, homemade modification with a hacksaw. In Wilson, the barrel's edge was visibly jagged, which intuitively is going to impact... I know, but that's only because your client decided to do it in probably a safer way than otherwise is there. But whether it's short barrel because someone hacks it, or whether it's short barrel because somebody takes one off of a short one and puts it on a different base, it seems to be the same thing. Your Honor, it sounds like one of the premises of your question is that Mr. Moore's rifle was modified in a way that is safer and less dangerous, and frankly, more common than the dangerous and unusual weapons at issue in Miller. No, the premise of my question is it seems to be really, really, really, really close to what the Supreme Court said was okay to regulate in Miller. That's the premise of my question. Your Honor, I believe in Miller we were dealing with a very specific weapon, but I understand the court's point. Do you have any other issues that you think are important here? Yes, Your Honor. I think on the motion for new trial, I'd like to really emphasize that what we have is a confrontation between two grown men after a juror behaved recklessly with a loaded firearm, so recklessly that his behavior jeopardized the safety of Mrs. Moore. You have a Faretto argument. I did raise a Faretto argument as well, Your Honor. But what I'd like to emphasize ... It's a suppression argument. That's correct, Your Honor. And that's pending in the other case. It's similar to an issue pending in the other case. It's the same identical issue in the other case. And one of the things that astonished me about the briefs in this case is that neither side hardly had a word to say about the other case, which is the far most serious case, and has a bearing on how acquainted the defendant in this case was about how cases are tried, how juries are picked, the importance of having a legal counsel and what not. He sat through a four-day trial involving seven counts, right before he went to trial in this case. Yes, sir. Right? Yes, sir. Yeah. Don't you think all that is relevant in this case? I think Your Honor does raise a ... What I'm saying, his experience as going to a criminal trial in a serious case and observing everything that happens, do you think that's relevant in this case? Your Honor, I do think that his legal background and experience is absolutely relevant. To answer Your Honor's question about why we didn't get too much into that ... I can't imagine ... Yeah. We weren't appointed on those cases, on that additional case. Our knowledge of the ins and outs is limited, but I do have to concede Your Honor's correct about it's relevant. We're faced with the suppression issue case. The other case isn't set for trial yet, I mean for argument. We're taking the first crack at that case. Yes, Your Honor. All right. I'll reserve the rebuttal. Thank you. Okay. Very well. Yep. You reserve the remaining time for rebuttal. Ms. Acosta, let's hear from you. Winifred Acosta, on behalf of the affiliate, the United States. May it please the court, good morning, Your Honors. I'll start right in just addressing quickly the issue that my counterpart raised, which was on the Second Amendment. It's our position that we do recognize that Robinson doesn't follow the prior precedent rule. However, we do believe that the issue has been resolved. Robinson is certainly persuasive authority for this court to consider, and we believe that Robinson in conjunction with- It was published though, right? It was not published. That is correct. Yes, Your Honor. That doesn't bind us. Yes, that's correct. I understand you think it resolved the issue, and certainly it decided- Yes, Your Honor. ... to turn that case. We have to decide that on our own, right? Yes, Your Honor. That is absolutely true. How should we decide it on our own? Your Honor, we still believe that Robinson still is persuasive authority, and we believe that based on Wilson, which addressed a sawed-off shotgun, which we believe is similar to a short-barrel rifle, it's not protected under the Second Amendment. Should we ... Are we to read the line of cases, starting with Heller afterwards, that as long as it's in the NFA, as long as it's in the National Firearms Act on that list, that is inherently a non-regular firearm, and therefore it's categorically excluded from the Second Amendment analysis? I think that can be considered, yes, Your Honor, but I also think that- That seems a broad argument. I understand that, yes, Your Honor, but I also think it's important to look at which firearms are actually commonly used by law-abiding citizens for lawful purposes, and we believe that just like the sawed-off shotgun, a short-barrel rifle, especially so many that Mr. Moore had, it's not protected under the Second Amendment, and so we would rely, again, on Robinson, on Wilson, on Miller, and the post-Heller cases. If the statute ... I just want to be clear. If the National Firearms Act, instead of allowing it under a tax regime that's limited, as your counsel, I think, accurately stated, instead was, there is a categorical prohibition against any of the possession of these particular products, the list that we've just been talking about. Yes, Your Honor. We would not have to run a Bruin analysis? That sort of would just be categorically outside of all of it? Well, relying on DuBois, we don't believe that the Bruin-Rahiman analysis is necessary to be conducted to answer this question as to whether or not there's a violation of the Second Amendment. But DuBois did not talk about, or DuBois, I never know how to pronounce that one either, that talked about whether felons fell within the people or not for the Bruin analysis. This is sort of a very different part of the Second Amendment, dealing with the kind of arms that are used or not. I'm not sure DuBois captures that issue. I guess for the type of arms, are we simply to say, just like if you're not within the people, if it's not within the arms, it just doesn't qualify at all? And how do we make that call about what's within the arms that were commonly used? Is that your burden? Is that theirs? Is it for the court to decide? How do we decide that issue? I think we have to rely on the statute. And we do recognize that the court believes that it could be seen as broad. But here, when something is as clear as a short barrel rifle, and then you look at that in comparison to the sawed-off shotgun, it's just really not the type of firearm that law-abiding citizens use in a lawful manner. And so, we feel as though it's not protected under the Second Amendment. Irregular rifle, though, does kind of seem to me exactly the kind of firearm that was used at the time of our founding. I mean, people just had muskets in their house. Some of them homemade or made in their local communities. There wasn't sort of a regularization for those things. This seems pretty close to what, and your opposing counsel makes this argument in her brief, this seems pretty close to the kinds of firearms that, in fact, were used at the time of the founding. Unlike a shotgun, which is double-barreled and had sort of like grape shell to it, unlike other things, this does seem like the kind of item, sort of a homemade rifle, that one would take out to the square to meet the redcoats. We understand that, Your Honor. But again, if you look at it contemporarily, I'm sorry, if you look at it today, I mean, this is just not the type of weapon that the average person is possessing with lawful purposes. I understand historically there may be some argument, but when you, again, when you look at DeBoer, our position is that you don't even have to take that route to conduct the Barun-Rahimi analysis. We fall back on what this court has already said in Robinson. I know it's not binding, but it's still persuasive authority. I would like to move on to the second issue, which my counterpart raised, which was the motion for new trial. Overall, Your Honors, what we would say is that a common theme seems to be that Mr. Moore adds to or supplements every motion that he files. I think that it's very important to look procedurally to see what exactly was before the district court at the time of each denial. With the motion for new trial, before the district court, with the first motion, there wasn't very much there. Simply, Mr. Moore alleged that after the verdict, he and his family members realized they knew the juror and that the juror knew them and that he had this disagreement with the juror and that based on these prior contacts, it was likely that the juror had not provided a truthful answer. What Mr. Moore did not include in that motion was anything about the gravity of this disagreement, anything explaining the late discovery. The district court ruled that Mr. Moore did not make any showing as to why he was late to discover this information and why it could not have been learned earlier had he exercised due diligence. Can you explain that? I understand there are some motions that you're talking about where the supplement came after the deadline. I think those are categorically different, but here, the way that I understand the new evidence rule under the new trial procedure, as long as it's within three years and it's new evidence, it can be brought forward. In his supplement, he explained, he said, listen, I'm half blind. I couldn't see the guy and I wasn't able to talk to my wife during this because the marshals told me I wasn't allowed to have communication with anyone during this fairly quick trial. I think it was about a day. Isn't that an explanation for why he wasn't able to bring it forward and how do we address that? Your Honor, his wife was present for the trial and there was nothing preventing his wife from speaking with standby counsel who was there throughout the course of the trial. There were also other family members which may or not have been in the courtroom, I believe. Can we judge his ability to discover based on what family members knew at the time? Is that what the rule is? Have we said something like that in other cases that we judge your ability to know from what your family members may or may not have known? No, Your Honor. The focus is on Mr. Moore's due diligence. When you look at the record, Mr. Moore says that he knew the juror for over ten years. What else did he say he knew about the juror? He had gone to his house. He knew the wife, Nicole, and the information that Mr. Moore had about the juror. He knew the name. He knew the juror's profession, what he retired from doing, his current possession, the location of the facility. He also knew that the juror was married. The juror's wife was an RN at Shands and he knew that the juror had a care and concealed weapons permit and that he liked to hunt. With all of this information, if Mr. Moore knew the juror for over ten years, if there had been some suspicion or some concern that—oh, and let me not forget the fact that Mr. Moore heard the juror's voice, which the infamous phone call, Mr. Moore would have heard that same voice. The phone call that I'm referring to is the phone call where Mr. Moore says that he confronted the juror about the shooting incident. So he would have heard that same voice. Based on all of that information, could the district court make a finding that despite what he's saying, for the reason he didn't bring this up earlier, in fact he would have known this and could have brought it up earlier if this were in fact true? That he should not—the district court found that he should have not needed his glasses if he knew the juror like he said that he knew him. It's also important that Mr. Moore never raised an issue about glasses throughout the course of the trial and there was documentary evidence, there were firearms, there were witnesses who testified and Mr. Moore was not bashful about raising any issues with the court. So had he raised this issue about glasses, then the district court could have addressed it during the course of the trial and we probably would not be here on this issue. So it's our position that Mr. Moore failed to show that—he failed to show that even if the allegations were true, that he could not have learned this information earlier had he exercised due diligence with all the information that he had. What about Judge Joe Flatt's question? So he asks, first of all, is the suppression issue in the middle district case the same exact suppression issue in this case? I believe there is a suppression issue. I know there is a suppression issue. Is it the same one that we have in this case? I believe in this case, color of office was raised and I'm not so sure that that was addressed in the middle district case. I may be wrong on that, but I don't believe that. Let's assume for the moment it is the same. It's the same search with essentially the same evidence, even if slightly different arguments. Yes, Your Honor. It would seem that this case is the tail wagging the dog, the dog being the 20-year sentence and the tail being the three-year sentence. Would it not make more sense for us to defer to that panel on the suppression issue? In other words, once someone decides the exact same issue, we can't sort of go the other way. We'd have to follow whatever was decided on that issue. Have you read the brief in the middle district of Florida case? Yes, Your Honor, I did. At some point, I did. It's a very, very skippy brief. It is. Yes, Your Honor. One issue. Yes, Your Honor. In an appeal with seven convictions, Hobbs Act convictions, and a conspiracy. Yes, Your Honor, and we had five issues here. Yes, Your Honor. It's the same issues as raised here. It was the same set of facts. Yes, Your Honor. It gave rise to the motion to suppress. Yes, Your Honor. Okay. That is correct. Judge Oaklett also asked, to what extent do we consider what happens, the self-representation of what happened in the middle district case for the FARETA analysis in this case? To what extent are they overlapped? Are they relevant? Well, I believe that during the course of the FARETA increase, I can't remember which one, but Mr. Moore did acknowledge the fact that he had sat through an entire federal criminal trial. Judge Windsor knew all about this Middle District of Florida case, did he not? Or let's put it this way. He knew there was a case in the Middle District of Florida? I believe so. He should have known. Yes, Your Honor. Yes. Yes, Your Honor. The government should have said, Your Honor, he has just been sentenced on seven counts in the Middle District of Florida case, which has a bearing on this case because this case stems from that. Yes, Your Honor. That is correct. The government did make mention of that. As a matter of fact, some of the records from the Middle District case were included as exhibits in this case. Yes, the court was aware of that. This is a matter of decency and fairness to the judge in this case. I would think that the government ought to fully brief the judge. Yes, Your Honor. What has just happened? I mean, an appearance was made in this case about one week after he was sentenced in the other case, so there was no mystery about anything. No, certainly not. There was no mystery. No, sir. As I mentioned, some of the records, the transcripts from the suppression hearing from the Middle District was included as exhibits in this case. Yes, the district court was aware. Sorry, I had to think about that. The district court was aware of the Middle District case. As I mentioned, during one of the colloquies, I believe the initial one, which was June 24th of 2004, Mr. Moore acknowledged the fact that he had sat through an entire trial and he had been represented, so that was part of his background. I know my time is wrapping up. The last thing I would like to mention is on the Motion for a New Trial. It's Mr. Moore's position that he did not remember the juror, but the juror should have remembered him. Is it reasonable for us to believe that Mr. Moore did not remember the juror, but not reasonable for us to believe that the juror did not remember Mr. Moore? I would ask that the conviction be affirmed on each ground. Thank you. Thank you. Ms. Kime, you've got three minutes. I'd like to start with a few points about the Second Amendment, and if I have time, I'd like to return just a bit to the first issue. The idea that the NFA, by simply prescribing or regulating certain weapons, has somehow moved them outside the scope of the Second Amendment really turns the Second Amendment on its head. The Second Amendment was designed to prevent against encroachments by the federal government, so the federal government can't simply dodge that with a legislative fix. There is a quote in one of the cases that's been cited, Thompson. It's a Supreme Court case that does reference in passing this concept that rifles are somehow more dangerous. I wanted to make clear that that aspect of the decision is very clearly articulating Congress's purpose in passing it, in passing that law, and not making an independent judgment about short-barreled rifles. We assume that trial counsel in this case had two lawyers, one of the stand-by, were fully briefed about that preceding case. In other words, they talked to the defense counsel and all that sort of thing. No, I wouldn't draw that assumption. They just were in the dark then. I don't know either way, and so I don't feel comfortable making a representation to the court about that. The decision in Miller doesn't explicitly state that it's about short-barreled, excuse me, sawed-off shotguns. It refers more broadly to short-barreled shotguns. The reason that we all know, and I don't think there's any academic or judicial dispute, meaningfully, about what the gun was at issue there. I looked into it. I was curious why. It's because Stevenson, the gun identified in the opinion, never manufactured a short-barreled shotgun during that time frame, so it necessarily would have needed to be sawed off, in which case it would be missing that choke function. Same with Wilson. I see I have just about one minute left. I wanted to emphasize on issue one, the motion for new trial, that the remedy specifically referenced short-barreled shotguns, not sawed-off ones. Your Honor, I believe that quote references a very particular type of shotgun, and I might be wrong, but I think they're referencing the M16. No, you're wrong. I mean, what Heller said is that the Second Amendment, quote, did not protect those weapons typically possessed by law-abiding citizens for lawful purposes, and it could have stopped there, but it didn't. It said, comma, such as short-barreled shotguns, and then cited to Miller. That's shotguns, Your Honor. Right, I get that, but it's not sawed-off. Oh, I understand the court's point. So I think if we were here on a short-barreled shotgun, I would be maybe making some of these same arguments for preservation purposes, understanding that the court would be bound by the actual language of Miller. But what you seem to be pinning it on is the only definitional difference that I see between the two, which is the rifling inside the barrel and the smoothness inside the barrel, and that just, I'm having trouble seeing how constitutionally that makes a difference. It's the addition of the characteristic feature of a shotgun, which is a choke feature, which is present only at the very end of the shotgun, if you were to saw that off. And respectfully, Your Honor, the issue of short-barreled rifles and shotguns really hasn't been subjected to meaningful adversarial testing at the Supreme Court level. This is kind of the first time that this factual point about shotguns has been raised. I've scanned briefs across the country and case law across the country. This is the first time I think the factual, the significant factual point has been raised regarding the specific safety feature that is removed in the process of sawing off the edge of a shotgun. Okay. Very well. Thank you both. Thank you, Your Honor. Case is submitted. We'll move to the second case, which is 25.